Filed 1/24/25  P. v. Zhu CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONGLI ZHU,<br><br>    Defendant and Appellant. | C100235<br><br>(Super. Ct. No. STK-CR-FE-2022-0003585) |

A jury convicted defendant Rongli Zhu of theft of utility services, possession of marijuana for sale, and the unlawful cultivation of marijuana.  The trial court sentenced defendant to two years of formal probation with 150 days in county jail.  Following a further hearing, the trial court ordered defendant to pay $364,038.09 in victim restitution to Pacific Gas and Electric Company (PG&E).

Defendant now contends (1) he should have been allowed to substitute his retained counsel, and (2) there is insufficient evidence to support the restitution amount.  Finding no merit in the contentions, we will affirm the judgment.

1

BACKGROUND

On March 31, 2022, David Granillo, a troubleshooter for PG&E, received a call that flames were shooting out of an electrical splice box in a Stockton neighborhood. Granillo determined that the fire was caused by an electrical overload and traced the problem to defendant's house, where a bypass had been installed to obtain power before the PG&E meter. Granillo cut the power to defendant's house. When defendant arrived at the house, Granillo followed him into the garage and found that cables from a subpanel were hooked up to grow lights, timers, fans, air conditioners, and water pumps.

Detective Matthew Felber from the San Joaquin County Sheriff's Department's narcotics task force was dispatched to defendant's house. Inside, he observed large trash bags filled with marijuana plant stems. Upstairs he found marijuana grow rooms with thousand-watt grow lights, filters, and oscillating fans attached to the walls. The detective counted 446 pots in the house used to grow marijuana. Based on the set up of the house and the potential marijuana yield, Felber opined that the purpose of the house was to cultivate and possess marijuana plants for sale and distribution.

Brandon Roux, a PG&E diversion investigator, determined that defendant started service with the utility on June 30, 2019. Roux visited the house and observed the bypass and the numerous rooms with grow equipment. By cataloging the equipment powered by the bypass, Roux determined that the total electricity used amounted to 837.072 kilowatt-hours per day. He identified September 12, 2019, as the day the theft of utility service began, based on a significant jump in average daily usage on that day and continuing thereafter. From that start date, an estimated 779,309 kilowatt-hours of electricity went through the bypass.

An information charged defendant with theft of utility services, possession of marijuana for sale, and the unlawful cultivation of marijuana. On the day set for trial, defendant requested a continuance and approval to substitute his retained counsel. The trial court denied the requests. The jury convicted defendant on all counts.

The trial court sentenced defendant to two years of formal probation with 150 days in county jail. Following a further hearing, the trial court ordered defendant to pay $364,038.09 in victim restitution to PG&E. Additional background details are set forth in the discussion as relevant to the contentions on appeal.

DISCUSSION

I

Defendant contends he should have been allowed to substitute his retained counsel.

A

A criminal defendant's constitutional right to the effective assistance of counsel includes the right to retain counsel of his or her choice. (*People v. Gzikowski* (1982) 32 Cal.3d 580, 586.) "The right of a nonindigent criminal defendant to discharge [a] retained attorney, with or without cause, has long been recognized in this state." (*People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*); see *People v. Lara* (2001) 86 Cal.App.4th 139, 152 (*Lara*).) Under the applicable test for retained counsel, the trial court should balance the defendant's interest in new counsel against the disruption flowing from the substitution. In doing so, the trial court must exercise its discretion reasonably. (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 (*Keshishian*).)

A continuance may be denied if a defendant is unjustifiably dilatory in obtaining counsel, or if the defendant arbitrarily chooses to substitute counsel at the time of trial. (*People v. Courts* (1985) 37 Cal.3d 784, 790-791.) A trial court may deny a request that will disrupt the orderly processes of justice. (*Ortiz, supra*, 51 Cal.3d at pp. 983-984; *Lara, supra*, 86 Cal.App.4th at p. 153.) It may also consider the difficulty of gathering parties, witnesses, and jurors at the same time and place. (*Ortiz*, at pp. 983-984; see *People v. Murphy* (1973) 35 Cal.App.3d 905, 915 (*Murphy*).)

We review the denial of a request to change retained counsel for abuse of discretion. (*People v. Lopez* (2018) 22 Cal.App.5th 40, 47.) "[A] trial court has 'wide

3

latitude in balancing the right to counsel of choice against the needs of fairness' and 'against the demands of its calendar[.]' " (*People v. Verdugo* (2010) 50 Cal.4th 263, 311, quoting *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 152.)  Defendant bears the burden to establish an abuse of discretion in denying a request to change counsel, and, absent such a showing, a reviewing court will not disturb the trial court's determination. (*Murphy, supra*, 35 Cal.App.3d at p. 915.)

B

On the day set for trial, September 6, 2023, the trial court asked for each party's estimate regarding the length of trial.  The prosecutor estimated four or five days and defense counsel agreed.  Based on that estimate, the trial court said motions in limine would be heard that day, a jury picked the next day, and evidence presented the following day.

When the trial court said it would proceed to rule on the motions in limine, defense counsel expressed defendant's desire for a continuance so that defendant could retain substitute counsel.  Defense counsel explained that he had spoken to the attorney defendant wished to retain, the attorney had not yet been retained, but the attorney's retention was contingent on a three-week continuance to September 27.  The trial court noted that the proposed new attorney had not been retained and was not present in court on the day set for trial to request substitution and a continuance.  The trial court said it would not grant a continuance on the mere possibility that defendant might retain new counsel.  The trial court denied the request for a continuance.

We find no abuse of discretion.  Defendant had known for some time that trial was set to begin on September 6, 2023.  Yet he waited until that day to express a desire for a continuance.  The week prior, his attorney had filed motions in limine and a witness list, giving every indication he would try the case.  Although defendant has a right to retain counsel of his choosing, he must be diligent in exercising that right, and the trial court has discretion to deny a continuance if a request is made at the start of trial without a

4

sufficient showing. Defendant made no showing as to why he waited until the day set for trial to seek a continuance and a "contingent" retention of new counsel.

Given the timing of defendant's requests and the lack of any showing on his part, the trial court did not abuse its discretion in denying the requests. (See *Keshishian, supra*, 162 Cal.App.4th at p. 429.)

II

Defendant further contends there is insufficient evidence to support the restitution amount.

A

Where "a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution . . . based on the amount of loss claimed by the victim. . . . The court shall order full restitution." (Pen. Code, § 1202.4, subd. (f).) " ' "While it is not required to make an order in keeping with the exact amount of loss, the trial court must use a rational method that could reasonably be said to make the victim whole, and may not make an order which is arbitrary or capricious." ' " (*People v. Phu* (2009) 179 Cal.App.4th 280, 283 (*Phu*).)

" ' "A victim's restitution right is to be broadly and liberally construed." ' " (*People v. Moore* (2009) 177 Cal.App.4th 1229, 1231.) The standard of proof at a restitution hearing is not proof beyond a reasonable doubt but a preponderance of the evidence. (*People v. Keichler* (2005) 129 Cal.App.4th 1039, 1045.) We review a challenge to the amount of victim restitution for abuse of discretion. (*People v. Baker* (2005) 126 Cal.App.4th 463, 467.) We "will not disturb the trial court's determination unless it is arbitrary, capricious and exceeds the bounds of reason." (*People v. Maheshwari* (2003) 107 Cal.App.4th 1406, 1409.) However, a reviewing court applies the substantial evidence standard when the defendant challenges the sufficiency of the evidence supporting the restitution order. (*Baker*, at pp. 468-469.) The court does not reweigh or reinterpret the evidence but determines whether there is sufficient evidence

5

supporting inferences drawn by the trier of fact.  (*People v. Millard* (2009) 175 Cal.App.4th 7, 26 (*Millard*).)

B

At the restitution hearing, PG&E investigator Brandon Roux testified that he calculated energy usage by inventorying the equipment in each room of the house, noting the power usage labeled on the equipment, and calculating the kilowatt-hours per day for each room to obtain a grand total for all the rooms of 837.072 kilowatt-hours per day.  A spreadsheet calculated an average daily quantity actually metered and an adjusted average daily quantity of the difference from what would have been metered based on the equipment found in the house.  The quantity for which defendant had paid was subtracted from the total quantity actually used to yield 779,309 kilowatt-hours yet to be paid.

On cross-examination, Roux agreed that the start date was selected in part based on the date stamped on the wiring.  He admitted that the date-stamping identifies the date of manufacture but not the date of shipping, purchase, or use.  At trial, Roux had testified that the wire to the grow lights was date-stamped July 2018, and the wire used for the bypass was date-stamped May 23, 2018.

PG&E also presented testimony from energy diversion specialist Brian Graddy. Graddy explained that September 12, 2019, was the date selected as the start of defendant's energy diversion because that was when the average daily usage jumped to 98 kilowatt-hours per day and remained high from then on.  The difference between the billing period in August 2019 and September 2019 was almost three times the energy usage.  He said September 12, 2019, was a good start day because, in his experience, such high energy usage is due to oscillating fans used in a grow operation.

Graddy added that the natural gas usage at the residence was low and flat with no peaks and valleys, suggesting there was no one living in the house.  There was no peak in the winter, when the biggest usage would be from the heater, and no drop-off in the spring and summer.  But electrical use remained high.  In Graddy's 28 years of

6

experience in energy diversion, this circumstance was indicative of grow houses.  He testified that a high number for electrical usage and a low number for gas usage is normal for indoor cultivation.

The dollar amount for electrical usage that should have been billed was based on a determination of how much electricity the equipment would have used minus what was billed.  PG&E billers determined the actual, variable rate charged for each of the billing periods.  Based on tiers of usage, the price varied from 500 kilowatt-hours to 6,500, and when the top tier was reached, it would stay at that rate for the rest of the month.

PG&E prepared a retroactive bill showing how defendant was billed for 931 days, including the energy charge and applicable taxes.  PG&E determined that defendant should have been billed for 847,989 kilowatt-hours.  It subtracted the kilowatt-hours for which he was billed to retroactively bill defendant for 779,309 kilowatt-hours over 931 days.  The charge for the 779,309 kilowatt-hours was $343,211.59.  Adding taxes, the total was $364,038.09.  The prosecutor said the total amount sought for restitution was $364,038.09 for the billing periods beginning on September 12, 2019, and ending on March 31, 2022, based on 779,309 kilowatt-hours.

Defense counsel argued PG&E had not shown a preponderance of evidence. He said Roux testified PG&E did not have a mechanism to identify how much power was sent to defendant's house, instead relying on an estimate that usage had been the same from "what they guessed was the start date."  Defense counsel asserted there was no certainty over what electricity was used on a given day.

The trial court observed that restitution for theft of services is not always an exact number and often is based on estimates.  It ruled that the People proved by a preponderance of the evidence that the estimates were reasonable.  It said the bypass start date of September 12, 2019, was reasonable based on the dramatic spike in energy usage. And it concluded the end date of March 31, 2022, when PG&E was called to the fire, was also reasonable.

According to the trial court, the evidence established that marijuana had been grown at the house. The evidence also showed that the electricity system had been bypassed. PG&E calculated the kilowatts based on the equipment used, to obtain a total of 847,989 kilowatt-hours. PG&E subtracted the energy billed to reduce the number to 779,309 kilowatt-hours. PG&E determined a daily rate from September 12, 2019 to March 31, 2022. The total plus taxes was $364,038.09.

The trial court acknowledged the amount was an estimate, but it found the estimate reasonable based on the evidence. The trial court awarded PG&E restitution in the amount of $364,038.09 for the period from September 12, 2019 through March 31, 2022.

Defendant contends the prosecution did not provide substantial evidence to support the amount of restitution, pointing to testimony that (1) the start date was based on the date stamped on the wiring but when the wiring was first used is not known; (2) the calculation of kilowatt-hours included the day when there was no power to the house and the day before, even though there was no evidence the house was receiving power; (3) the dates when equipment in the house was actually servicing marijuana was not known; and (4) PG&E's calculations assumed that the house and equipment remained the same for each month up to the end date. But we conclude the restitution amount was determined using a rational method and was based on substantial evidence.

Graddy testified that the start date for the bypass was selected based on a spike in energy use in mid-September 2019. Roux testified that the date stamped on the wiring was just one of the reasons for selecting the start date. At trial, Roux explained that the start date was picked because of a jump in usage. Restitution will not be denied because PG&E did not know exactly when defendant started stealing electricity. We find *Phu, supra*, 179 Cal.App.4th 280, instructive. In *Phu*, it also could not be ascertained with certainty when power was first diverted. (*Phu*, at p. 284.) However, the court there concluded that the date the defendant first subscribed to electrical service -- rather than

8

the later date the utility service discovered the diversion -- was a reasonable starting point. (*Ibid.*) Using the earlier date would ensure that the utility service was fully compensated for its losses. (*Ibid.*) The utility service's investigator testified that the commencement of service was the " 'best information' available as to when the theft of power began." (*Ibid.*) Here, the best information available was the tripling in energy usage consistent with the consumption of power for an indoor grow operation.

The court in *Phu* also endorsed the same method for calculating loss that PG&E used here. In that case, the utility service determined that the wattage of the equipment inventoried was a reasonable method of assessing usage. (*Phu, supra*, 179 Cal.App.4th at pp. 283, 285.) Here, Roux testified at trial and at the restitution hearing that PG&E determined the amount of power diverted by inventorying the equipment in each room, noting the wattage on the equipment labels, and using those numbers to determine the kilowatt-hours used per day in each room.

"At a victim restitution hearing, a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss." (*Millard, supra*, 175 Cal.App.4th at p. 26.) Once the victim has made a prima facie showing of loss, " 'the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*Ibid.*) In this instance, defense counsel argued PG&E did not know how much power was stolen but offered no compelling argument or evidence that the restitution amount should be other than what PG&E claimed. (*People v. Goulart* (1990) 224 Cal.App.3d 71, 83 [noting that defendant had ample opportunity to present evidence discrediting the restitution estimate but chose not to, even though only defendant could show the details of when illegal diversion occurred].) Moreover, PG&E's " 'lack of personal knowledge [regarding the period of time and amount of the theft of power] was not due to any fault by [PG&E]; rather, it was defendant's misappropriation . . . that led to [PG&E's] inability to conclusively determine' the precise extent of the theft." (*Phu, supra*, 179 Cal.App.4th

9

at p. 284.) Denying restitution because the precise start of the theft, or the exact amount of power stolen, could not be determined would allow defendant to profit from the uncertainty created by his criminal conduct.

The trial court did not abuse its discretion, and its restitution determination was based on sufficient evidence.

## DISPOSITION

The judgment is affirmed.

_____/S/_____
MAURO, J.

We concur:

_____/S/_____
EARL, P. J.

_____/S/_____
ROBIE, J.